## THE CALYPSO.

(Circuit Court of Appeals, Ninth Circuit. February 14, 1916.)

No. 2545.

1. SHIPPING ☞79—"MASTER"—AUTHORITY AS AGENT FOR OWNER.

The master of a ship is pro hac vice the agent of the owner, and like any other agent his appointment and authorization lie in contract, and unless he is appointed, or his appointment is authorized by the owner, he is not lawfully master, although enrolled as such, and neither the owner nor his interest in the vessel is liable for his acts; and where the ownership is divided the power of appointment rests with those owning more than a half interest.

[Ed. Note.—for other cases, see Shipping, Cent. Dig. §§ 333, 334, 337, 338, 348; Dec. Dig. ☞79.

For other definitions, see Words and Phrases, First and Second Series, Master.]

2. ALIENS ☞36—VIOLATION OF CHINESE EXCLUSION ACT—FORFEITURE OF VESSEL—MASTER.

The owner of a one-sixth interest in a gasoline launch, without the knowledge or consent of the owner of the remaining interest, and contrary to a written agreement with him, had himself enrolled as master, and as such used the launch to bring a load of contraband Chinese from Mexico to a port of the United States. Held, that the interest of the majority owner in the launch was not subject to forfeiture under Chinese Exclusion Act May 6, 1882, c. 126, § 10, 22 Stat. 61, as amended by Act July 5, 1884, c. 220, 23 Stat. 115 (Comp. St. 1913, § 4297), providing for the forfeiture of any vessel "whose master shall knowingly" violate the act.

[Ed. Note.—For other cases, see Aliens, Dec. Dig. ☞36.]

Appeal from the District Court of the United States for the First Division of the Northern District of California; Maurice T. Dooling, Judge.

Libel by the United States for the forfeiture of the gasoline launch Calypso for violation of the Chinese Exclusion Act. From the decree libelant appeals. Affirmed.

For opinion below, see 217 Fed. 669.

John W. Preston, U. S. Atty., of San Francisco, Cal., for the United States.

Black & Clark, of San Francisco, Cal., and Warren E. Lloyd, of Los Angeles, Cal., for appellee.

Before GILBERT and ROSS, Circuit Judges, and RUDKIN, District Judge.

RUDKIN, District Judge. The present libel was filed in the court below to forfeit to the United States the gasoline launch Calypso, her

boats, tackle, apparel, furniture, and cargo, for a violation of section 10 of the act of Congress of May 6, 1882, entitled "An act to execute certain treaty stipulations relating to China" (22 Stat. 58), as amended by the act of July 5, 1884 (23 Stat. 115). The section in question provides as follows:

"That every vessel whose master shall knowingly violate any of the provisions of this act shall be deemed forfeited to the United States, and shall be liable to seizure and condemnation in any district of the United States into which such vessel may enter or in which she may be found."

The launch in question was built for the respondent, Sassaman, and one Pettenger during the year 1912 at a cost of about $10,000. Of this sum Sassaman contributed $5,000 and Pettenger $1,000. Seven hundred and sixty dollars advanced by the Los Angeles Creamery Company, secured by two mortgages on the launch, and $3,400 advanced by one Singleton and secured by an agreement for a mortgage on the launch, make up the balance of the construction cost. The launch was owned jointly by Sassaman and Pettenger, the former owning a five-sixths interest and the latter a one-sixth interest. On the 22d day of May, 1913, Sassaman was regularly enrolled as master of the launch by the collector of the port of Los Angeles, and thereafter, by his request, and with his consent, Oren H. Dickason was enrolled as master on the 2d day of July, 1913, Ralph L. Lopes on the 15th day of July, 1913, and James H. Castle on the 13th day of September, 1913. Between May and October, 1913, the boat made regular trips between San Pedro and Avalon, Catalina Island, and for some time after October 1st short trips were made locally from San Pedro to Long Beach and to different battleships in the harbor. On the 24th day of November, 1913, Pettenger, without the knowledge or consent of Sassaman, procured his own enrollment as master of the launch, in lieu of Castle, and was enrolled as such master at the time of the contraband voyage which gave rise to the present controversy. Some time prior to Christmas, 1913, Pettenger took the launch on a trip to San Diego for the purpose of smuggling a load of contraband Chinese into the United States; but for reasons not disclosed by the record his plans miscarried. In the early part of 1914 Pettenger, accompanied by three companions and a Chinaman named Lee, took the launch on a trip to Mexico, returning to Monterey Bay with a load of contraband Chinese and contraband opium, which were surreptitiously landed on the 16th day of January. The launch was there seized by government officers, and is clearly liable to condemnation so far as the interest of Pettenger is concerned, and also so far as the interest of Sassaman is concerned, if Pettenger was the master of the launch within the meaning of the law. The court below decreed a forfeiture as to the interest of Pettenger, but denied a forfeiture as to the interest of Sassaman, and from the latter branch of the decree this appeal is prosecuted.

[1] The master of a ship is pro hac vice the agent of the owner, and like any other agent his appointment or authorization lies in contract. The registry and enrollment statutes are only for the protection of the revenues, and if the master has not been appointed

by the owner enrollment cannot make him such. If, on the other hand, the master has been appointed by the owner, the failure to register or enroll will not impair his authority. So, too, the power of appointment and removal rests in those having more than one-half ownership of the vessel. Rev. Stat. U. S. § 4250 (Comp. St. 1913, § 7995).

[2] Unless, therefore, the appointment of Pettenger as master was consented to or acquiesced in by Sassaman, or unless Sassaman has been guilty of some act of omission or commission which renders him or his property liable for the acts of Pettenger, his interest should not be forfeited.

"Penalties and forfeitures, although generally the consequences of crime or guilt, do not necessarily imply the one or the other. As the forfeiture of a man's property is one of the severest punishments that the law can inflict, the mind is naturally perplexed by two considerations of directly opposing tendency—the one being the principle of natural justice, which revolts at the punishment of the innocent; the other, the apparent necessity of doing that very thing in view of public policy, in order to prevent those shifts and subterfuges by which the revenue laws are evaded. The statute must be clear and unequivocal which imposes upon a court the duty of punishing one man for the fault of another. The object of section 3450 is to punish all persons who, with intent to defraud the government of the tax, remove or conceal goods upon which the tax has not been paid, and, in addition to the punishment of such persons, it provides that all conveyances and animals used in the accomplishment of this unlawful purpose shall be forfeited. Undoubtedly there is a presumption against any one whose property is found employed in this unlawful business that it is so engaged with his consent, but can it be that this presumption is irrebuttable? The contention of the government is that, this being a proceeding in rem, it is the guilty thing that has offended, and that this is to be forfeited, irrespective of any participation of its owner. If this team and wagon had been stolen from the owner, it would be clearly unjust, unreasonable, and preposterous to forfeit it because it was used by the wrong doer in the transportation of illicit liquor. If this exception is admitted, it would follow that property has no guilty character, except as connected with persons who have charge of it, and the result is that it is the duty of the court to inquire into the facts; and if it appears clearly that the owner has not hired or loaned it to another for an unlawful purpose, or knowingly permitted it to be in the possession of a party likely to engage in an unlawful business, or negligently suffered it to be controlled by a stranger, whose character gave no assurance that it would not be unlawfully employed, or is in some way justly chargeable with blame or negligence, he ought not to suffer the sweeping condemnation that justly falls upon those who consciously violate the law, and upon those upon whom is laid the duty of vigilance, and who negligently or otherwise fail in that duty." United States v. Two Barrels of Whisky, 96 Fed. 479, 481, 37 C. C. A. 518, 520, and cases cited.

See, also, United States v. Wilton (D. C.) 43 Fed. 606.

Whether Pettenger was master of the launch at the time of the seizure, and whether Sassaman, through negligence or otherwise, has rendered himself and his property amenable to the law for the acts of Pettenger, are questions of fact, to be determined from the testimony. Sassaman testified that he never authorized the enrollment of Pettenger as master, and had no notice that he was so enrolled until long after the seizure; that he had a written agreement with Pettenger that the latter would not take the launch out on any trip without his permission, and that he gave no such permission; that

he had no notice or knowledge that the launch was to be taken out, and no notice or knowledge of the illicit enterprises in which Pettenger was engaged. All the surrounding circumstances seem to corroborate Sassaman, and if a forfeiture is to be decreed the decree must rest on the uncorroborated testimony of an admitted accomplice in crime. The testimony of such a witness is always scrutinized with great care and acted upon with the utmost caution. He is discredited before the law, not only because of his complicity in the crime charged, but because we can never know what motives or inducements have prompted him to testify.

It may be said that this is not a criminal case; but it is none the less a proceeding on the part of the government to declare a forfeiture based on the criminal acts of this witness, and every inducement and every incentive that would prompt him to testify falsely in a criminal case are present in this case. The court below committed no error in declining to accept or act upon the testimony of such a witness, and its decree is affirmed.